```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION


United States of America,      )
                               )
     Plaintiff,                )
                               )
                               )
     v.                        )    No. 18 C 8346
                               )
Nedjo Milosevic                )
                               )
     Defendant                 )
```

MEMORANDUM OPINION AND ORDER

In this action, the government seeks to denaturalize Nedjo Milosevic under 8 U.S.C. § 1451(a), claiming that he obtained U.S. citizenship illegally and by willful misrepresentation or concealment of a material fact. Milosevic is a former citizen of Yugoslavia and later of the Republic of Bosnia and Herzegovina. He applied on behalf of himself and his family for admission to the United States as refugees in September of 1998, and he became a naturalized United States citizen in November of 2004. The government claims that Milosevic fabricated, concealed, and misrepresented various facts to obtain admission to the United States, to adjust his status to that of a permanent resident, and ultimately to become a United States citizen. It seeks summary judgment on three of the five counts it asserts in the complaint: Count II, which claims that Milosevic fraudulently procured admission as a permanent resident by misrepresenting his place of

residence and by concealing his military service with the Zvornik Infantry Brigade of the Army of Republika Srpska ("VRS") during the Bosnian Civil War; Count IV, which claims that Milosevic never met the statutory definition of "refugee," which is the foundation for all of the immigration benefits he sought and received; and Count V, which claims that Milosevic obtained United States citizenship by concealing and willfully misrepresenting facts that were material to his eligibility for naturalization.[1] Because I conclude that Milosevic is entitled to have a finder of fact determine whether the errors and omissions he admits making in materials he submitted to the Immigration and Naturalization Service ("INS") and at immigration interviews are sufficient to establish the elements of these claims, I deny summary judgment.

I.

Milosevic, an ethnic Serb, was born in Zivinice, a city located in what was then Yugoslavia and is now Bosnia and Herzegovina.[2] He lived in the Zivinice region until sometime in 1992, when he and his wife Snezada, also an ethnic Serb, left the region out of fear of conflict with the local Muslim population. In April of 1992, Snezada relocated with her parents to Loznica, Serbia, which was

---

[1] The government previously moved under Fed. R. Civ. P 12(c) for judgment on the pleadings as to Count IV. Applying the summary judgment standard but considering only matters set forth in the pleadings and their exhibits, I denied that motion on September 27, 2019. *See United States v. Milosevic*, 414 F. Supp. 3d 1119, 1121 n. 2 (N.D. Ill. 2019) (explaining the applicable standard).
[2] The facts recounted here are undisputed unless otherwise noted.

just across the border and a half hour bus ride from Zvornik, a town in Bosnia that was controlled by ethnic Serbs. Milosevic also left Zivinice in April of 1992, after his work supervisor told him that "because of the presence of Muslim radicals at the place where I was working nobody can guarantee us any safety and that he would advise me not to come back there." N. Milosevic Dep., ECF 60-5 at 111:8-11. Milosevic went to a nearby village, but after the Muslim military police attacked the village on May 25, 1992, he and others fled to the forest, then on to several other villages, sleeping "wherever we could. We slept with cousins. We slept with friends." N. Milosevic Dep., ECF 60-5 at 62:17-20. By September of 1992, Milosevic and his wife had moved into an apartment in Zvornik, which the municipal government had given them, and which had previously belonged to Muslims.[3] Their elder son was born in Zvornik in 1993.

By December of 1992, Milosevic had become a member of the military police of the Army of Republika Srpska (the Bosnian Serb army, or "VRS"). In the VRS, Milosevic wore a uniform, carried a weapon, engaged in combat, and was obliged to follow orders; he considered the VRS an "army." Def.'s L.R. 56.1 Resp., ECF 86-7 at ¶ 25; N. Milosevic Dep., ECF 60-5 at 29:13-30:4. The parties dispute

---

[3] Milosevic testified that a Muslim family had moved into an apartment that Milosevic's father owned in Zivinice, explaining that this "was something that was just done. If Serbs would go to Muslim territories they would move into their homes. If the Muslims would go to Serbian territories they would move in their homes. So it was just a normal thing that was done." N. Milosevic Dep., ECF 60-5 at 79:20-24.

3

whether Milosevic was conscripted into the VRS or joined of his own volition, and also whether he became a member before or after his relocation to Zvornik. In any event, they agree that Milosevic served in the VRS from at least December of 1992 through the signing of the Dayton Accords that ended the war in Bosnia in 1995, and that he continued to receive payments from the VRS until at least June of 1996.

From 1995-1999, Milosevic and Snezada lived most of the time in Loznica, where they applied for and received refugee status from the Serbian government. *See* Def.'s L.R. 56.1 Resp., ECF 86-7 at ¶ 77; N. Milosevic Decl., ECF 86-2 at ¶ 5. They also spent time in Zvornik during this period, where they maintained the apartment they received from the government in 1992, and where their younger son, who was born in Loznica in September of 1998, was baptized. In or around September 3, 1998, while in Loznica, Milosevic submitted an application for classification as a refugee (his "Refugee Application") to INS with the assistance of the International Organization for Migration ("IOM"), a contractor for the State Department. To prepare the application, Milosevic met with a woman from IOM who asked him many questions, including about his service in the VRS, all of which he claims to have answered truthfully. N. Milosevic Decl., ECF 86-2 at ¶ 14. He also told the woman that he and his family could not return to their home in Zivinice because it was not safe for Serbs. *Id*. Milosevic returned to the IOM office

4

at a later time, and the woman he had spoken to previously gave him forms written in English and told him to sign them. Because Milosevic could not speak or read English, he asked what the forms said; she told him that she had filled in the forms with the information he had provided. *Id.* at ¶¶ 15-16.

Milosevic's Refugee Application referenced and incorporated an IOM "Case Summary Sheet" setting forth the basis for his refugee claim. As Milosevic admits, this Case Summary Sheet is replete with falsehoods and descriptions of events that never occurred. For example, it states that Milosevic's house in Zivinice was "searched and ransacked by Muslim policemen" and that Milosevic "was taken to the police station by two Muslim policemen for interrogation and kept there for an hour." It goes on to state: that Snezada "fled on 10 Sep 92 with the help of a Muslim friend, wearing typical Muslim clothes," and that Milosevic "was not allowed to leave the town since he was of draft age"; that "on 12 Oct 92, two policemen took [Milosevic] to the Muslim headquarters in town, interrogated him, beat him with fists, rifle butts and an army belt," and that he "was released after three days and was left outside of town"; and that "in Mar 93 Muslim soldiers came to the village and picked up all the men of draft age of Serb ethnicity and took them to the nearby front line where he was assigned to forced labor" where he was required to "dig trenches and to cut wood for Muslim soldiers" who insulted him. Def.'s L.R. 56.1 Resp., ECF 86-7 at ¶¶ 86-99.

5

There is no dispute that these facts are false, and that the events described never occurred. Additionally, Milosevic acknowledges that although his Refugee Application solicited information about his past military service, he disclosed only his compulsory military service with the Yugoslav army in the 1980's and failed to mention his service in the VRS from 1992-1996.

Milosevic later appeared for an interview, accompanied by his wife and his two young sons, as part of his application for classification as a refugee in the United States. N. Milosevic Decl., ECF 86-2 at ¶ 17. The interview was conducted through a translator and lasted 15-20 minutes, during which time the interviewer asked "if all of the information in the forms [he] had signed was true." *Id*. at ¶ 18. Milosevic confirmed that they were. According to Milosevic, the interviewer did not ask him about his service in the VRS. *Id*. His application was approved, and he was asked to sign additional forms written in English, which he similarly did not understand. *Id*. at ¶ 19.

Milosevic and his family were admitted to the United States as refugees in July of 1999. In October of 2000, while living in Idaho, Milosevic filed an application to register permanent residence in the United States (his "Adjustment Application") with the help of a Bosnian Muslim friend, as Milosevic's English was still limited. The friend explained to Milosevic the information he understood the Adjustment Application to solicit, and Milosevic answered the

6

questions truthfully. In response to a question about past military service, Milosevic again included only his service in the Yugoslav army. As with his Refugee Application, Milosevic believed that his Adjustment Application provided the information the form requested, and that it contained English translations of the truthful information he provided based on his understanding of the questions. *See* N. Milosevic Decl., ECF 86-2 at ¶¶ 20-23.

Finally, in 2004, Milosevic filed an application for naturalization (his "Naturalization Application") without assistance. He answered all of the answers as he understood them. The form he filled out did not include a question about military service. *Id*. at ¶¶ 24-25. Thereafter, he appeared for a brief interview that he claims lasted only 5-10 minutes, at which he affirmed that everything in his application was true. N. Milosevic Decl., ECF 86-2 at ¶ 27. His application was approved, and he became a United States citizen.

## II.

Summary judgment is appropriate if the government establishes that there is no genuine dispute over any material fact and the undisputed facts entitle it to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law controls which facts are material, and a genuine dispute over such facts exists if the "evidence is such that a reasonable jury could return a verdict for

7

the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The revocation of American citizenship is a serious matter. *Fedorenko v. United States*, 449 U.S. 490, 505 (1981) ("once citizenship has been acquired, its loss can have severe and unsettling consequences"); *see also Schneiderman v. United States*, 320 U.S. 118, 122 (1943) (emphasizing the "priceless benefits that derive" from United States citizenship). While the government may, and, indeed, must institute proceedings to denaturalize a citizen whose naturalization was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation," *see* 8 U.S.C.A. § 1451(a) ("[i]t shall be the duty of the United States attorneys" to institute denaturalization proceedings in such cases), the government must prove its case by "clear, unequivocal and convincing evidence," as "[a]ny less exacting standard would be inconsistent with the importance of the right that is at stake in a denaturalization proceeding." *Fedorenko*, 449 U.S. at 505-06.

Naturalization is "illegally procured" if "the congressionally imposed prerequisites to the acquisition of citizenship" are not met when naturalization is granted. *Id*. at 506 (1981); *see also United States v. Kairys*, 782 F.2d 1374, 1376 n.1 (7th Cir. 1986)

("Naturalization is illegally procured if any statutory requirement is not met at the time naturalization is granted."). Lawful admission to the United States is a statutory prerequisite to naturalization under 8 U.S.C.A. § 1429. An applicant is inadmissible if he seeks to procure admission by fraud or willful representation of a material fact. *See* 8 U.S.C. § 1182(a)(6)(C)(i). "When the government relies on § 1182(a)(6)(C)(i) in asserting fraud as a basis for inadmissibility, it must establish four elements by clear and convincing evidence: (1) the alien misrepresented a fact, (2) he did so willfully, (3) the misrepresentation was material, and (4) the alien procured an immigration benefit as a result." *Asentic v. Sessions*, 873 F.3d 974, 980 (7th Cir. 2017).

The government asserts that it is entitled to summary judgment on Counts II and V because both claims turn on evidence that Milosevic committed fraud through material misstatements and omissions made to procure immigration benefits, and Milosevic acknowledges that his submissions and statements in each of his Refugee Application, his Adjustment Application, and his Naturalization Application were replete with falsehoods. But Milosevic argues that his misrepresentations and omissions were neither willful nor material, as he was unaware that his applications reflected anything but the truthful account he gave to the IOM representative, and he did not realize that his submissions omitted information the applications solicited. Milosevic also

argues that the undisputed record does not establish that he procured his U.S. citizenship as a result of his false statements and omissions, since the record contains sufficient facts to qualify him as a refugee, and because his membership in the VRS did not automatically disqualify him from the immigration benefits he received.

The Seventh Circuit's decision in *Asentic* offers a helpful framework for analyzing the questions of both willfulness and materiality. In that case, the court affirmed the BIA's finding that Asentic, also a Bosnian Serb, was removable on the basis that he "was inadmissible when he arrived in the United States because he had willfully failed to disclose his VRS service[.]" 873 F.3d at 980. Like Milosevic, Asentic prepared his refugee application with the assistance of an IOM representative who interviewed him in Serbian, then gave him forms to sign in English. *Id*. at 977. Also like Milosevic, Asentic served in the Zvornik brigade during the conflict in Bosnia but disclosed only his military service with the Yugoslav army in his refugee application. *Id*. And again like Milosevic, Asentic did not cure the omissions in his written submissions in subsequent immigration interviews, during which he was under oath and assisted by an interpreter. *Id*.

Unlike Milosevic, however, Asentic intentionally omitted his VRS service based on advice from the IOM representative, who told him to "keep quiet about his service" because it could jeopardize

10

his refugee claim. *Id*. This distinction is critical. "Under § 1182(a)(6)(C)(i), willfulness is evaluated from the subjective perspective of the person who made the misrepresentation." *Id*. at 980. On the evidence before it, the *Asentic* court concluded:

> Asentic's misrepresentation was willful because he deliberately and voluntarily omitted his VRS service. When MacQueen interviewed him in 2006, Asentic admitted knowing it was unlawful to omit information from his refugee application. He also conceded that the omission was motivated by fear that candor would harm his chances of gaining refugee status. These admissions establish that Asentic knew his incomplete answer about military service was false and that he deliberately advanced that falsehood.

*Asentic*, 873 F.3d at 981. Milosevic, by contrast, states that he was unaware that his Refugee Application failed to disclose his VRS service and that he would have disclosed it during his refugee interview had he been asked about it. A fact finder may or may not find Milosevic's testimony credible in view of his admission that he viewed the VRS as an "army," particularly alongside the testimony of Stephen Gabriel, the immigration officer who conducted Milosevic's refugee interview, who reviewed his interview notes and testified that he asked Milosevic specifically about his military service.[4] But credibility is not an issue that can be resolved at summary judgment. *See, e.g., Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) (reiterating that at summary judgment, courts must

---

[4] Gabriel also testified that his notes reflected that Milosevic reiterated the falsehoods regarding the basis for his refugee claim during his interview. *See* Gabriel Decl., ECF 60-14 at ¶¶ 23, 25, 26.

11

"suspend[] credibility determinations" even where the non-movant's position is based on "some fairly outrageous accusations"). I am not convinced that on the record before me, a reasonable fact finder is compelled to find that Milosevic's false statements and omissions were willful.

The materiality of Milosevic's false description of persecution and omission of his VRS service, however, is beyond reasonable dispute. While it is true that the record here lacks the admission of materiality the court found in *Asentic,* where the defendant "purposely left his VRS service off his immigration forms because he feared that full disclosure could result in further questioning and unfavorable decisions," *Asentic*, 873 F.3d at 981, materiality—unlike willfulness—does not hinge on the applicant's subjective intent. Where, as here, the government offers uncontroverted evidence that "a truthful statement would have resulted in further investigation by an immigration official, then the misrepresentation is certainly material." *Id*. at 981 (citing *United States v. Latchin*, 554 F.3d 709, 714 (7th Cir. 2009) (because the applicant's misrepresentation had a "natural tendency to influence" the naturalization decision, it was sufficient to establish materiality)). Here, the declaration of Stephen Gabriel states that:

> representations in [Milosevic's] Refugee Application, including the accompanying documents, and his statements during his refugee interview—particularly his representations that he was persecuted in Bosnia and was

12

>  not involved with any military or paramilitary group—were central to my decision to approve his Refugee Application.

Gabriel Decl., ECF 60-14 at ¶ 27. Mr. Gabriel further stated that "if I determined, or even suspected" that an applicant had been affiliated with a military or paramilitary organization, "I was directed to ask numerous follow-up questions to determine the extent of their affiliation/membership. My goal in asking about an affiliation with these organizations was to determine whether the applicant had participated in any persecutory activities." *Id*. at ¶ 6. This evidence forecloses any argument that the falsehoods and omissions in Milosevic's refugee application were immaterial. *See Latchin*, 554 F.3d at 714 ("[i]t matters not that there is no firm evidence showing Latchin's application would have been denied absent his lie; Latchin's misrepresentation had a 'natural tendency to influence' the naturalization decision, and that is all that is required."); *United States v. Salem*, 496 F. Supp. 3d 1167, 1180 (N.D. Ill. 2020) ("'Materiality' means that something has 'a natural tendency to influence' a naturalization decision.") (quoting *Kungys v. United States*, 485 U.S. 759, 772 (1988)).

It is true that since *Latchin* was decided, the Supreme Court ruled in *Maslenjak v. United States*, 137 S. Ct. 1918, 1929 (2017), that when the Government relies on an "investigation-based theory" to prove a causal connection between an applicant's false statement during naturalization proceedings and the acquisition of

13

citizenship—that is, when it argues not that facts the applicant misrepresented "in and of themselves justify denial of citizenship," but rather that the truth, if disclosed, could have "led to the discovery of other facts which would do so"—the government "must make a two-part showing to meet its burden." *Id*. at 1929 (citations and internal quotation marks omitted):

> As an initial matter, the Government has to prove that the misrepresented fact was sufficiently relevant to one or another naturalization criterion that it would have prompted reasonable officials, "seeking only evidence concerning citizenship qualifications," to undertake further investigation. [*Kungys*], at 774, n. 9, 108 S. Ct. 1537. If that much is true, the inquiry turns to the prospect that such an investigation would have borne disqualifying fruit. As to that second link in the causal chain, the Government need not show definitively that its investigation would have unearthed a disqualifying fact (though, of course, it may). Rather, the Government need only establish that the investigation "would predictably have disclosed" some legal disqualification. *Id*., at 774, 108 S. Ct. 1537; *see id*., at 783, 108 S. Ct. 1537 (Brennan, J., concurring).

*Id*.[5] Milosevic relies on *Maslenjak* and a handful of other cases to argue that the government has not established the materiality of his false statements because it has not shown that he was actually ineligible for the immigration benefits he received. *See* Def.'s Opp., ECF 86 at 19-21 (citing, *inter alia*, *United States v. Maslenjak*, 943 F.3d 782, 786 (6th Cir. 2019), *Munyenyezi v. United*

---

[5] Although *Maslenjak,* like *Latchin*, addressed the requirements of 18 U.S.C. § 1425(a), both decisions relied heavily on *Kungys*, which interpreted the statute at issue here. Indeed, the *Maslenjak* Court noted in its citation to *Kungys* that both statutes concern illegal procurement of naturalization. *See* 137 S. Ct. at 1929 and n. 5.

*States*, 989 F.3d 161, 167 (1st Cir. 2021), and *United States v. Malik*, No. 15-9092-CM, 2019 WL 2054110, at *6 (D. Kan. May 9, 2019)). But as the *Maslenjak* Court acknowledged (and, indeed, as Justice Gorsuch, in his concurring opinion, noted with disapproval), the question of actual ineligibility is an issue of *causation* in the context of naturalization proceedings, not of materiality. *See* 137 S. Ct. at 1927 and n. 4 (majority opinion) and 1931-32 (Gorsuch, J., concurring in part). Or, in the *Latchin* court's framing, whether the naturalized citizen is actually ineligibile for citizenship bears on the "procurement" element of § 1451(a), not on the separate and independent materiality requirement. 554 F.3d at 713 (citing *Kungys*, 485 U.S. at 767).

So where does this leave Mr. Milosevic? Under the law of this circuit, the government has indeed established that Milosevic's false statements concerning past persecution and his omissions concerning his membership in the VRS were material because they had a natural tendency to influence the naturalization decision. Nevertheless, because the government has not shown that Milosevic was actually ineligible for naturalization, that issue remains for trial. *See Latchin*, 554 F.3d at 714 ("At the end of the day, then, the government only wins if it shows that the citizen misrepresented a material fact and it is 'fair to infer that the citizen was actually ineligible.'") (quoting *Kungys*, 485 U.S. at 784, (Brennan J., concurring)). The government argues that the undisputed facts

15

here "easily satisfy" the fair inference standard, but that argument ignores Milosevic's testimony that he did not realize his submissions to the INS contained false claims of persecution and failed to disclose his VRS service, and that he was not asked direct questions probing those statements and omissions during his interview. A finder of fact might find this testimony far-fetched; but it is not so patently implausible that no reasonable juror could credit it.

    Finally, I conclude that Milosevic raises a genuine dispute as to whether he met the statutory definition of "refugee" at relevant times,[6] precluding summary judgment on Count IV. The government argues that Milosevic did not meet this definition because he was not "unable or unwilling to return to" Bosnia, and because he was not outside of Bosnia because of a "well-founded fear of persecution." But the evidence is undisputed that Milosevic and his family were outside of Bosnia in Loznica, Serbia at the time he submitted his application for refugee status in September of 1998. The government emphasizes that Milosevic and his family maintained an apartment in Zvornik and that they spent at least some of their time there in 1998 (although, as Milosevic observes, there is no evidence that they owned or had any rights to the apartment at that time, which the local government "gave" them to live in after its

---

[6] I presume that this question must be evaluated as of the time Milosevic submitted his Refugee Application, although the parties' briefs do not address the question of timing.

16

previous occupants were expelled in 1992). But the government's cited authorities do not persuade me that Milosevic's episodic stays in Zvornik disqualify him from refugee status as a matter of law.

Setting aside the admittedly untrue facts and omissions in Milosevic's refugee application, a fact finder crediting Milosevic's testimony about the circumstances of his departure from Zivinice in May of 1992 could reasonably conclude that he suffered past persecution. And as the government's own cases confirm, if Milosevic establishes that he was persecuted in Zivinice, the burden then shifts to the government to show that he could reasonably have relocated to another area of Bosnia. *See*, e.g., *Singh v. Holder*, 699 F.3d 321, 333 (4th Cir. 2012) (past persecution establishes a "rebuttable presumption" of well-founded fear); *see also N.L.A. v. Holder*, 744 F.3d 425, 431 (7th Cir. 2014) ("If the applicant can establish that she has suffered past persecution on the basis of a protected ground, the existence of a well-founded fear is presumed.... The Government can rebut the presumption by showing either a fundamental change in conditions in the applicant's home country or that, under all the circumstances, it would be reasonable to expect the applicant to relocate to another part of the applicant's country.") In the government's view, the evidence makes clear that the Milosevic family could reasonably have relocated to Zvornik to escape persecution, but Milosevic offers sufficient contrary evidence to entitle him to try the issue. *See* N. Milosevic

17

Decl., ECF 86-1 at ¶ 10 (noting that Zvornik was a small city "very close to areas under Muslim control," and that like many inhabitants of the city, Milosevic and his family "could not travel freely" in the surrounding area due to safety concerns). Accordingly, the government is not entitled to summary judgment on the theory that Milosevic could have neutralized his fear of persecution through internal relocation to Zvornik and thus failed to meet the statutory definition of "refugee."

### III.

For the foregoing reasons, the government's motion for summary judgment is denied.

**ENTER ORDER:**

*Elaine E. Bucklo* (signature)
**Elaine E. Bucklo**
United States District Judge

Dated: March 31, 2022